Karl PETERSON, Plaintiff,

v.

FIDELITY & DEPOSIT CO. OF MARY-
LAND, Defendant.

Civ. A. No. 3064–67.

United States District Court,
District of Columbia.

June 22, 1971.

James P. Schaller, Washington, D. C.,
for plaintiff.

Alexander M. Heron, Washington, D.
C., for defendant.

OPINION

CORCORAN, District Judge.

I.

In 1963 the plaintiff was President,
Director, and holder of approximately
one-half of the outstanding shares of
stock of a small contracting firm, Ox-
ford Constructors Corporation (herein-
after "Oxford"). Lee Butler, Jr. owned
the remaining one-half of the corpora-
tion.

During the period here involved, Ox-
ford had contracts with M. J. Bles Con-
struction Co. for the construction of a
part of the Potomac Interceptor Sewer
in Virginia, (hereinafter the "Virginia
Job"). It also had a contract with La-
Sal Constructors, Inc. for the construc-
tion in Maryland of another part of the
same sewer, (hereinafter the "Maryland
Job").

The defendant, Fidelity and Deposit
Company of Maryland, (hereinafter "Fi-
delity") executed, as surety, perform-
ance and labor and material payment
bonds on both jobs.

By June, 1963, Oxford had encoun-
tered severe financial difficulties and
the plaintiff requested Fidelity to ad-
vance enough money to Oxford to enable
it to continue its work under the con-
tracts. Fidelity agreed to release $30,-
000 which Oxford had deposited with it
as collateral provided two conditions
were met: (1) That Oxford demonstrate

its faith in its ability to complete the work by raising $20,000 working capital; and (2) that this $20,000, the released collateral, any retainages released by LaSal and Bles, and all future receivables from either the Virginia or Maryland jobs be placed in joint accounts under the joint control of Oxford and Fidelity.

On or about June 14, 1963, the parties agreed orally that:

1) Oxford would assign all balances due or to become due from the Virginia and Maryland jobs into two checking accounts to be carried in the joint names of Oxford and Fidelity.

2) Plaintiff and Butler would each contribute an additional $10,000 to Oxford—the $20,000 so raised to be deposited in the special joint accounts.

3) Fidelity would release the $30,000 collateral into such joint accounts.

4) Fidelity would recommend to M. J. Bles the release of any retainages held by Bles, the retainages, if released, to be placed in the joint accounts.

An assignment and power of attorney were prepared by Fidelity and executed by plaintiff and Oxford on June 21, 1963, under the corporate seal of Oxford Constructors. The joint bank accounts were to be established in the Union Trust Company, and on June 25, 1963, plaintiff and Oxford executed a "Resolution to Establish a Joint Account" on a preprinted form supplied by Union Trust. Due to a misunderstanding, the joint accounts at Union Trust were not opened until July 10, 1963. In the meantime, plaintiff's check for $10,000, together with Mr. Butler's check for $10,000 were deposited in Oxford's corporate account at Suburban Trust Company on July 1, 1963. During the delay in opening the joint accounts, numerous bills were paid from Oxford's Suburban account so that on July 10, 1963 when the balance in the corporate account was transferred to the joint accounts only $14,000 of the original $20,000 remained.

The joint accounts, designated respectively the "Virginia Account" and the "Maryland Account", were subject to signature on behalf of Oxford by plaintiff, as its President, and by Mr. Tambellini, as Secretary. They were subject to countersignature on behalf of Fidelity by either Messrs. Fisher, Kroll or Gordon. The agreed system of operation was that prior to drawing any given check representatives of Oxford would advise the surety of the nature and amount of the check and the surety would then indicate if it would co-sign such a check, if drawn.

Thus after the establishment of the joint accounts, all of Oxford's bills arising under the Virginia and Maryland jobs were paid by Oxford with checks co-signed by Mr. Fisher of Fidelity. Included among the payments out of the joint accounts were obligations for taxes owing to the U. S. Government, to the States of Maryland and Virginia, and to the District of Columbia. Fidelity, however, refused to co-sign checks to cover withholding taxes owed to the U. S. Government.

By late September, Oxford was unable financially to continue and had to abandon the two jobs.

On October 1, 1963, the Internal Revenue Service made demands on the plaintiff, as an officer and director of Oxford,[1] to pay over to the Internal Revenue Service the amount of withholding taxes due. Plaintiff paid out $800 of his personal funds and incurred a further penalty October 4, 1967 under 26 U.S.C. § 6672 in the amount of $3,506.76.

Plaintiff contends that the oral agreement of June 14, 1963 looked to the pay-

1. The Internal Revenue Code authorizes an assessment against persons having "control" of monies used for the payment of payrolls or wages but who fail to withhold from such payments the amount of taxes due in connection therewith. 26 U.S.C. § 6672. Plaintiff maintained at all times to both Fidelity and the Internal Revenue Service that the surety was obligated to pay these taxes.

ment of all "legitimate job cost obligations" including withholding taxes, that Fidelity breached their contract and accordingly Fidelity owes the plaintiff that amount which he personally paid the Internal Revenue Service.

Plaintiff further contends that the defendant's actions constitute a breach of the June 14 agreement, a breach of trust and fiduciary obligation, and that as a result of this breach plaintiff should recover the $10,000 working capital deposited by him at the insistence of the defendant in the joint accounts.

The defendant contends, however, that only "legitimate *bonded* liabilities" were covered by the agreement and that withholding taxes were not included under bonded liabilities.

## II

Plaintiff relies principally on Pacific National Insurance Company v. United States, 270 F.Supp. 165 (N.D.Calif. 1967), aff'd 422 F.2d 26 (9th Cir.), cert. denied, 398 U.S. 937, 90 S.Ct. 1838, 26 L.Ed.2d 269 (1970) where the Court held that the surety was liable to the United States for withholding taxes in a situation where it was established that the surety exercised control and dominion over disbursement of the contractor's funds.

There, as in the instant case, the contractor encountered financial difficulties. It advised the surety of its difficulties and indicated its inability to meet its obligations unless the surety came to its assistance. The surety offered to advance to the contractor suffi-

cient funds to enable it to continue its work under the construction contracts under an agreement whereby: (1) Special accounts were to be established for each of the contractor's construction jobs; (2) all of the contractor's receivables, as well as a "loan" from the surety, were to be deposited in the special accounts; (3) all payments to be made by the contractors were to be subject to approval by the surety; (4) following approval, the surety was to certify monies out of the special accounts into the contractor's general account to meet obligations.

The surety, however, refused to approve the payment of withholding taxes claiming (as does the surety here) that it was not liable for payment of withholding taxes under Section 6672 because payment of such taxes was not one of the obligations under the surety bond,[2] and because it was not the "employer" of the employees from whose wages the taxes were withheld.

The Court however held that Section 6672 was broad enough to reach an entity which assumes the function of determining whether or not an employer will pay taxes withheld from the employees.[3] The Court found (1) that the surety exercised dominion and control over the contractor's funds and determined which of the contractor's obligations would be paid and when; and (2) that the contractor would not have placed all its potential income under the control of the surety if it had known that the surety would not release funds to provide for withholding taxes.

2. Sureties have since agreed that if they finance continuation of construction by a distressed contractor, it would be unfair not to assume responsibility for the tax liability generated by the wages paid to the employees of the contractor. Hearings on HR 11256 and HR 11290, Comm. on Ways and Means, 89th Congress, 2nd Session, 273 (1966).

3. It should be noted that § 105(b) of the Federal Tax Lien Act of 1966, 26 U.S.C. § 3505(b) enacted subsequent to the events herein and to *Pacific National* ex-

plicitly states that when a surety supplies funds for the payment of employees of the contractor it is also responsible for their withholding taxes. The fact that this section is subsequent to § 6672 and requires the same result reached by the *Pacific National* Court under § 6672 is of little significance. It is well settled that "views expressed in a subsequent session of Congress * * * can have but little relevance to the intent of an earlier session of Congress." Brown v. United States, 426 F.2d 355, 357, 192 Ct.Cl. 203 (1970) and cases cited therein.

## III

The facts in the instant case are strikingly similar to those of *Pacific National*.[4] Clearly in this case the surety exercised dominion and control over the funds available for payment of "job cost obligations" incurred by Oxford in completing work on its two contracts. The procedure for drawing checks fairly illuminates this dominion and control.

When Oxford placed all its cash and receivables in the joint accounts which were effectively controlled by Fidelity, it placed itself completely at the mercy of Fidelity. It could do nothing unless Fidelity approved. And it is inconceivable that Oxford would have taken such a step if it had known that the surety would refuse to co-sign checks for withholding taxes thereby leaving the officers of Oxford subject to criminal sanctions. This clearly could not have been the intent of the parties. Thus the surety having assumed responsibility for paying employee's wages also assumed responsibility for the taxes withheld from those wages—i. e. the surety became a "person required to collect, truthfully account for, and pay all withholding taxes" within the meaning of Section 6672.

As Judge Browning said in *Pacific National*, this section

> "was designed to cut through the shield of organizational form and impose liability upon those actually responsible for an employer's failure to withhold and pay over the tax. It would frustrate this purpose needlessly to imply a condition limiting the application of the section to those nominally charged with controlling disbursements of a corporate employ-

er, thus immunizing those who, through agreement with or default of those nominally responsible have exercised this corporate function in fact." Pacific National Insurance Company v. United States, *supra* 422 F.2d at 31.

To hold contrariwise would "permit the surety to use tax moneys in discharging its obligations to complete performance of the contract and limit thereby its liability by channeling funds for the work through the distressed contractor." *Id.* This is an unacceptable result.

It is immaterial that Oxford might have gone out of business in any event even if the surety had signed the withholding tax checks. The fact remains that the taxes were part of the legitimate job obligations and that Oxford had assigned all its funds to the joint accounts.

The Court, therefore, concludes that plaintiff is entitled to reimbursement from the surety for that amount of money he personally paid over to the Internal Revenue Service to cover withholding taxes.

The Court also concludes, however, that the plaintiff is not entitled to recover the $10,000 working capital additionally contributed by the plaintiff to Oxford. There is no question but that such working capital was devoted to the payment of the day by day operations of Oxford in an attempt to keep the company afloat. There is no direct relationship between the imposition of tax and penalties after the company had failed and abandoned the jobs, and the earlier contribution of capital which had been dissipated before the tax problem arose.

Counsel for plaintiff will submit an appropriate order within ten (10) days.

---

4. The only apparent factual difference between *Pacific National* and the case at bar is that Oxford, unlike the contractor in *Pacific National*, was required by the surety to raise additional funds to be deposited in the special accounts and that the Government in *Pacific National* chose to sue the surety rather than the contractor.