UNITED STATES of America, Plaintiff,

v.

Nicholas FALINO, Defendant.

No. 70–C–773.

United States District Court, E. D. New York.

Nov. 16, 1977.

David G. Trager, U.S. Atty., Eastern District of New York, Brooklyn, N.Y., for plaintiff, John R. Tjaden, Trial Atty., Tax Division U.S. Dept. of Justice, Washington, D.C., of counsel.

Austin & DuPont, Mineola, N.Y., for defendant, Stephen J. Masse, Mineola, N.Y., of counsel.

BARTELS, District Judge.

This action was brought by the United States in 1970 to collect the unpaid balance of $7,854.33 and interest (aggregating in October, 1977, a total of approximately $16,610.36) due on a tax assessment made against the defendant, Nicholas Falino, in March, 1963. The assessment was for withholding taxes which had become due between January, 1960 and March, 1961, on wages paid to the employees of Rogers & Haggerty, Inc., a general contractor, of which Falino was president.

Although Falino was president of Rogers & Haggerty during the period for which taxes were due, he did not have control of the corporation's funds. Instead, the corporate funds became subject to the control of National Surety Corporation ("National"), pursuant to certain agreements executed between Falino and National, the surety under a Performance and Payment Bond threatened with default.

After consideration of all the testimony and exhibits, the court has concluded that under the circumstances of National's control, Falino cannot be held liable for the assessed withholding taxes. In support of this determination, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Rogers & Haggerty, Inc. ("R & H"), a New York corporation, was engaged in general construction contracting business. Defendant, Nicholas Falino, was president, treasurer, and sole stockholder of R & H during the five quarters between January 1, 1960, and March 31, 1961, for which the Government now seeks unpaid taxes. During said period, the defendant's wife, Phyllis Falino, was secretary of R & H.

2. On February 1, 1959, R & H entered into a contract with the New York State Dormitory Authority for the construction of a dormitory at the State University Teachers College at New Paltz, New York. In order to obtain this construction contract, it was necessary for R & H to secure a surety bond guaranteeing complete performance of the contract, which it did by obtaining a Performance and Payment Bond from National on February 1, 1959.

3. While no notice of default was received by R & H from the Dormitory Authority, the Dormitory Authority did, in August, 1959, advise National that the performance by R & H was deficient, and demanded that extensive stress tests be made upon the concrete which R & H had poured for the dormitory floors.

4. Discussions were held between National, the Dormitory Authority, and R & H during which a compromise was reached on the extent of testing which would be necessary. In the course of these discussions, National was advised by R & H that even the agreed upon tests would cause delays and increased costs which would make it financially impossible for R & H to complete the project.

5. National's own investigation revealed that the financial condition of R & H was such that R & H would be incapable of completing the construction project without extensive financial assistance from National. As a condition to providing such assistance, in the form of advances for wages, supplies and other expenses, National compelled R & H to grant it complete control over funds from the Dormitory Authority payable to R & H with respect to the New Paltz construction project.

6. National's control over R & H's funds was established by agreements dated No-

vember 20 and December 2, 1959, under which all funds from the Dormitory Authority due to R & H were to be deposited in a special joint checking account at the Meadow Brook National Bank, Long Island, or were to be forwarded directly to National. Funds deposited in the special joint account could be withdrawn only through checks signed either by an officer of R & H when countersigned by a representative of National, or when signed by National alone.

7. The special account contained funds reflecting payments by the Dormitory Authority to R & H and funds deposited by National to enable R & H to complete its performance. Moreover, the indemnity agreement, executed as consideration for the Performance Bond and signed by R & H and Falino, provided that upon default all funds due and owing to R & H from any source were automatically assigned to National. Following National's assumption of financial control over R & H, all such funds were accordingly deposited in the special joint account.

8. At the time the special joint account with National was approved, R & H continued to maintain a separate general checking account at the Meadow Brook National Bank, the cumulative balance in which did not exceed $1,000.00, against which Falino made several small payments to himself during the period for which withholding taxes are due.

9. Falino's salary was paid by checks drawn on the special joint account, at least forty-five of which contained the signature of Falino and a countersignature of National's representative. Five such checks were not countersigned, but were signed by Falino alone with National's prior approval. National on at least one occasion wrote to the Meadow Brook National Bank approving the payment of specified special account checks which had not been countersigned by National, but at the same time it reaffirmed the necessity of a countersignature in the future on special account checks signed by Falino.

10. Periodically, as a matter of mechanics for the payment of payrolls and a few days before such payments, funds were transferred, with National's approval, from the special joint account at the Meadow Brook National Bank to the Hugenot Bank in New Paltz, the job site where wages were to be paid. The amount approved by National for such transfer was equal to the cash wages which were to be paid to workers on the construction site. In addition, National approved the transfer of limited funds to the Hugenot Bank when needed for cash payments to local suppliers providing goods at the New Paltz site.

11. Although requested on numerous occasions by R & H to release funds for the payment of the withholding taxes due on the cash wages being paid to the construction workers, National refused to do so. This refusal was based on National's interpretation of the then current authorities which indicated that a surety was not liable for such withholding taxes even though it had taken over the funds of its insured which were necessary to complete performance of a contract and to pay wages due with respect thereto. National did, however, release funds for payment of taxes which had become due during a period prior to its assumption of financial control over R & H.

12. Throughout the period of National's control over R & H's funds, R & H prepared, and submitted to National, weekly payrolls for the New Paltz construction project which reflected both gross and net wages due. R & H also prepared Federal tax returns, Form 941, reporting taxes that were to be withheld from the wages of employees. Falino, as president of R & H, signed these returns and submitted them to the Internal Revenue Service. However, because of National's control over R & H's funds, no payments were made with these returns.

13. While fully cognizant of the agreement between R & H and National with respect to the disposition of R & H's funds, the Government never instituted an action against National for payment of the taxes due, although the IRS did place a lien on the special joint account. This it did not do,

**156**

however, until the balance in the account reflected funds contributed wholly by National. Subsequently, the IRS freed the account from the lien without any explanation.

14. The Government also made no effort to satisfy its claim directly out of funds due from the Dormitory Authority to R & H. Although the IRS did temporarily place a lien on these funds, it later removed that lien as it did the lien on the joint account.

15. Rather than proceeding against R & H or National, the Government instead chose to proceed directly against Falino by way of an assessment. On March 8, 1963, the Internal Revenue Service assessed Nicholas Falino $14,268.43 for withholding taxes accruing between January 31, 1960 and February 28, 1961.

16. Accordingly, between October, 1963 and December, 1969, Falino paid $3,721.18 to satisfy said claim. By levying on Falino's life insurance policy, the IRS collected an additional $2,033.15. Three additional credits were made against the assessment and as of October 12, 1977, there remained due the principal sum of $7,854.33 and interest and fees of $8,756.03, for a total of $16,610.36.

17. In addition to levying on his life insurance policy, the IRS garnished Falino's salary each time he sought and secured employment after R & H ceased operations. The result of these garnishments was the repeated loss of employment by Falino.

### CONCLUSIONS OF LAW

1. This court has jurisdiction over this action by virtue of 26 U.S.C. §§ 7402(a) and 6672, and 28 U.S.C. §§ 1340 and 1345.

2. There may be more than one person charged with the duty and obligation to account for withheld taxes, but there must be at least one such person. *See Kalb v. United States*, 505 F.2d 506 (2d Cir. 1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975).

3. Every employer has the duty and responsibility of withholding, accounting for and paying over to the United States those taxes which the law requires to be withheld. 26 U.S.C. §§ 3102(a) and 3402(a). The term "employer" as used in these sections is defined in 26 U.S.C. § 3401(d) as follows:

> "For purposes of this chapter, the term 'employer' means the person for whom an individual performs or performed any service, of whatever nature, as the employee of such person, except that—
>
> (1) if the person for whom the individual performs or performed the services *does not have control of the payment of the wages for such services, the term 'employer' . . . means the person having control of the payment of such wages*". (Emphasis supplied.)

4. Falino has the burden of proving that the assessment against him was erroneous, *Sherwood v. United States*, 246 F.Supp. 502 (E.D.N.Y.1965); *United States v. Lease*, 346 F.2d 696 (2d Cir. 1965); *United States v. Strebler*, 313 F.2d 402 (8th Cir. 1963), and this court concludes that he has sustained that burden.

5. In 1960 and 1961, when National refused to pay the withholding taxes due on wages paid to R & H's employees, there was legal authority (not the Supreme Court), to the effect that surety companies in performance bond cases were not liable for such taxes even though they had taken control over the funds of their insured.

6. Since the 1970 decision in *Pacific National Insurance v. United States*, 422 F.2d 26 (9th Cir.), *cert. denied*, 398 U.S. 937, 90 S.Ct. 1838, 26 L.Ed.2d 269, *rehearing denied*, 400 U.S. 883, 91 S.Ct. 116, 27 L.Ed.2d 121 (1970), interpreting 26 U.S.C. § 6672, the authorities are clear that a surety company which has taken control of funds of a contractor under a performance bond is liable for payment of all taxes due to be withheld on wages paid to the contractor's employees.

7. *Pacific National* held that the purpose of 26 U.S.C. § 6672, under which the present action was brought, is "to cut through the shield of organizational form"

and reach those who are "actually responsible for an employer's failure to withhold and pay over the tax." 422 F.2d at 31. It further held that only by interpreting the section to cover those who have "the final word as to what bills should or should not be paid, and when," can the purpose of the section be effectuated. 422 F.2d at 31, citing *Wilson v. United States*, 250 F.2d 312 (9th Cir. 1958), and *White v. United States*, 372 F.2d 513, 178 Ct.Cl. 765 (1967). This interpretation of § 6672 was also applied in *Peterson v. Fidelity & Deposit Co. of Maryland*, 330 F.Supp. 424 (D.D.C.1971).

8. Section 3505 of Title 26 of the United States Code, enacted in 1966, effective January 1, 1967, and thus not directly applicable to the instant case, provides that:

"If a lender, surety, or other person supplies funds to or for the account of an employer for the specific purpose of paying wages of the employees of such employer, with actual notice or knowledge (within the meaning of section 6323(i)(1)) that such employer does not intend to or will not be able to make timely payment or deposit of the amounts of tax required by this subtitle to be deducted and withheld by such employer from such wages, such lender, surety, or other person shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) which are not paid over to the United States by such employer with respect to such wages. However, the liability of such lender, surety, or other person shall be limited to an amount equal to 25 percent of the amount so supplied to or for the account of such employer for such purpose."

9. Although the taxes at issue became due prior to the enactment of § 3505 and prior to the decision in *Pacific National*, the taxes in *Pacific National* had also become due prior to the passage of § 3505, and *Pacific National* specifically held that the surety was nevertheless liable for such taxes just as it would have been after the enactment of § 3505.

10. Between January 31, 1960, and February 28, 1961, the time the assessed taxes became due, Falino no longer had control over the funds paid into R & H's special joint account or the funds advanced by National. Consequently, Falino no longer had the power to withhold and pay such taxes, and cannot be held liable for his failure to do so. The only funds under Falino's control when the taxes became due were the limited balance in R & H's general checking account, not in excess of $1,000.00, for which Falino could properly be held accountable.

11. National had control over the funds from which the taxes should have been paid during the period in question, but it refused to do so. Consequently, National violated 26 U.S.C. § 7501, which gave rise to a potential cause of action against it pursuant to 26 U.S.C. § 6672. The Government, however, never pursued such an action against National and such a claim is now time-barred under 26 U.S.C. §§ 6501 and 6533, and 28 U.S.C. § 2462.

12. The sum of $5,754.33 was illegally collected from the defendant, Nicholas Falino, which more than offsets any amount (not in excess of $1,000.00) which was in the separate R & H account under Falino's control.

13. For the above reasons, the Government cannot now recover from the defendant, Nicholas Falino, the withholding taxes due from R & H for the five quarters, between January, 1960 and March, 1961, at issue in this case, and, therefore, judgment must be rendered in favor of the defendant, Nicholas Falino, dismissing the Government's complaint, with prejudice.

SO ORDERED.