**In re KREIDLER IMPORT CORPORA- TION, Alleged Debtor.**

**Bankruptcy No. 79–11947.**

United States Bankruptcy Court, D. Maryland.

May 14, 1980.

Alan S. Kerxton, Martin Jacobs, Earl W. Kinther, Washington, D. C, for Kreidler Import Corp., Inc.

E. Stephen Derby, Baltimore, Md., for Kreidler Werke, GmbH.

MEMORANDUM OPINION

GLENN J. GOLDBURN, Bankruptcy Judge.

On October 30, 1979, Kreidler Werke GmbH (hereafter KW) filed a petition alleging that the Kreidler Import Corporation (KIC) is not paying its debts as they become due. KIC is the United States marketer for KW's mopeds which are manufactured in Germany. The parties stipulated that there are more than twelve holders of claims which aggregate over $5,000.00.

In view of these stipulations, Section 303(b)(1) of the Bankruptcy Code requires two or more additional entities to join KW's petition to commence an involuntary case against KIC. To that effect, J. Ruel Baker, Richard A. Bartl, Rockville Mopeds, Inc., Ronald Alverson and M. L. Alverson d. b. a. Alverson's Moped Land, Daniel Brown, Slemons Leasing and Auto Rental, Inc., d. b. a. Jim Slemons Imports—JAWA and Robert Barnes fined intervening creditor's petitions. Richard A. Bartl, Rockville Mopeds, Inc. and Robert Barnes subsequently moved for leave to withdraw their petitions. Orders were entered authorizing withdrawal by Bartl and Rockville Mopeds but no such authorization was granted to Barnes because his application to withdraw was not filed until the trial had commenced.

At this stage, the intervening petitions of Barnes, Baker, Brown, Alversons and Slemons remained, and the alleged debtor, KIC, challenged the validity of each of them. The Court determined that it was in the best interests of judicial economy to rule on the intervention by all five of the claimants.

The Alversons' claim arose out of a March 21, 1979 distribution agreement entered into by KIC and Ronald and M. L. Alverson. The Alversons agreed to represent "Kreidler Mopeds" in the State of California, and were to receive ten percent of gross sales for dealers they established through June 30, 1979, and four percent thereafter. Ronald Alverson testified that he and his wife established twenty-two dealers before June 30, 1979, and that they have received partial compensation. In July of 1979, Philip Poling, president of KIC, sent the Alversons a payment and a payment schedule. On the reverse of the schedule was a handwritten note: "Mel and Ron: Sorry for this delay—Future payments will be made timely every 15th of each month." (Plaintiff's Exhibit 1). Alverson also testified that there was an oral

agreement that the distribution contract could be terminated by thirty (30) days written notice, and that neither party has so terminated the contract, although Charlie Small became the KIC California distributor in October, 1979. On cross examination, Alverson stated that his wife "had the final say" regarding their Moped business and that a meeting took place in August 1979, between Poling, Mrs. Alverson and Daniel Brown, the office manager and sales representative for the Alversons.

Philip Poling, the president of KIC, testified that through conversations with Mrs. Alverson, he determined that their contractual relationship was terminated in August 1979. Prior to that, Mrs. Alverson indicated to Poling that "things weren't working out as they should", and that she had a new proposal "to become a full blown distributor". However, Mrs. Alverson never sent a new proposal to KIC, nor did she present one when Poling met with her in California in August 1979. Poling testified that he made his final payment to the Alversons around August 15, 1979. He stated that nothing more was due because Mrs. Alverson said she was no longer interested in the arrangement, that she had shipped certain parts back to KIC, and that she had the business phone disconnected. Poling also testified that the Alversons never made a written demand for payment nor did they call to complain about payment due.

In rebuttal, Mr. Alverson testified that parts were shipped back at Poling's insistence, and that the Alversons have not been compensated ten percent of $72,428.00 in sales made.

The definition of "claim" in Section 101(4) is extremely broad and includes, "(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, dis-

puted, undisputed, secured, or unsecured." The Court finds from the testimony and exhibits that the Alversons have a claim against KIC although such claim is disputed. Since, under the new Code, disputed claims are nonetheless claims, the Alversons' intervening petition will be allowed. The Court also finds that the August payment to the Alversons did not constitute a voidable preference which would prevent their claim from being counted to reach the requisite number of creditors. This payment falls within the Section 547(c)(2) exception which protects transfers in the ordinary course of business.

KIC also challenged the intervening petition of Robert Barnes as unqualified because Barnes received a preferential transfer on November 7, 1979, after the petition was filed. Plaintiff's exhibit 2 shows that a settlement agreement was entered into between KIC and Barnes obligating KIC to pay him $2,500.00 payable $500.00 each month. One thousand dollars is still outstanding. KIC challenged the November 1979 payment as a preferential transfer.

Initially, it is not clear that the Code requires each of the three petitioning entities to be free of the taint of a preferential transfer. Section 303(b)(2) requires that no such claimant could be counted to determine whether there are fewer than twelve total creditors. However, Section 303(b)(1) refers merely to "three or more entities" without the exclusions of Section 303(b)(2). Under former Bankruptcy Act, case law developed the policy that although a creditor with a voidable preference may have had a provable claim, that creditor was only qualified to join in the involuntary petition if he surrendered his preference at some time prior to adjudication. *3 Collier on Bankruptcy*, para. 59.06(1.2) p. 573 (14th Ed.1977), and cases cited therein. *Collier* states that the petition will be dismissed if without the preferred creditor the petition is insufficient in the necessary number of petitioning creditors. *Id.*

The Court finds that neither the new Code nor its legislative history requires a departure from the case law existing un-

der the Act with respect to the disqualification of creditors in receipt of voidable preferences. The Act's treatment of this requirement is similar to the Code's in that the preference section is Section 59(e) of the Act dealing with whether there are more than twelve creditors of an alleged bankrupt. The Code also separates the preference section from the counting section, as pointed out above, in Sections 303(b)(1) and 303(b)(2). Thus, the construction advanced by KW that preferred creditors are not counted but are eligible to join in an involuntary petition was not accepted under the Act, and for similar policy reasons, this Court rejects such construction of the Code. Thus, if Robert Barnes received a preference, his intervening petition will not be allowed unless he surrenders the amount of the preference.

The Court finds that Barnes did receive a voidable preference under Section 547(b) when he received the $500.00 payment after the involuntary petition was filed. Since none of the exceptions to Section 547 apply, Barnes will not be allowed to intervene because he has not surrendered the preference.

J. Ruel Baker is the alleged debtor's landlord pursuant to a lease agreement executed between Baker and Philip Poling. KIC had advanced various theories including the nonassignability of the lease and the statute of frauds to prevent the qualification of Baker's petition. The Court, however, finds it unnecessary to decide these contentions because it finds that Baker has no claim against KIC at this time. Testimony by Poling and Edward L. Snyder, the interim trustee in this case, established that the rent has been timely paid and is now paid up some months in advance. Since no rent is due and owing, Baker has no right to payment as required by the definition of claim in Section 101(4). KW's argument that KIC qualified Baker by listing Baker as a creditor on its Rule 104(e) list is without merit since it is customary to list an alleged debtor's lessor along with the computed amount of rent which will be due under the unexpired portion of the lease.

Since Baker did not have a claim against KIC at the time the petition was filed, his petition will not be counted in determining whether three entities have joined in the petition.

KIC has objected to the intervening petition of Slemons Leasing and Auto Rental, Inc., d. b. a. Jim Slemons Imports—J.A. W.A. The basis of the Slemons claim is in a distribution agreement between Slemons and KIC executed in January 1977. KIC and KW have stipulated that during 1978 Slemons did not order or purchase 2600 mopeds from KIC which KIC contends was a breach of the distribution contract. (See joint exhibit 1.) The contract contains a liquidated damages clause. Slemons instituted suit on his claim in Orange County, California. In that suit, KIC has counterclaimed under the liquidated damages clause of the contract in an amount in excess of $100,000.00. If KIC's counterclaim is successful, it would completely set off the amount of Slemons' claim.

KW contends that KIC's counterclaim is only relevant to challenge the $5,000.00 jurisdictional amount required by the Code and not for the purpose of disqualifying Slemons as a petitioning creditor. The Court finds no support for this contention and relies upon Bankruptcy Rule 112, and case law which preceded the rule, that a bona fide counterclaim which exceeds the amount of a claim extinguishes that claim for the purpose of filing an intervening petition. *Harris v. Capehart-Farnsworth Corp.*, 225 F.2d 268, 270 (8th Cir. 1955) held that "the alleged bankrupts should have . . . set-offs or counterclaims which they are lawfully entitled to use in diminution or extinguishment of the claims of the three petitioning creditors against whom such counterclaims are asserted."

From the testimony and stipulations before it, the Court concludes that KIC's counterclaim has a bona fide factual basis, and as such it will extinguish the Slemons claim as a basis for an intervening petition.

The final creditor attempting to intervene is Daniel Brown, a former KIC

employee. The deposition of Brown and the testimony of Poling and Ms. Farri, the former KIC bookkeeper, established that Brown worked for KIC from February 1, 1979 until around July 28, 1979. His salary was $2,000.00 per month and he was authorized to draw up to $6,000.00 per year in expenses. (Poling Deposition pp. 388, 415).

The salary was to be paid in advance, and expense payments were intermittent, although Brown never requested any expenses because, as he stated, he "didn't have to". KW introduced all of the cancelled checks paid by KIC to Daniel Brown. (Plaintiff's exhibits 9 and 11). The amount paid by KIC in checks totalled $10,500.00. (Payment was stopped on one check which was mistakenly issued after Brown had left his job with KIC.) Brown also received two mopeds for which he is indebted to KIC in the amount of $1,100.00. Cash payments made to Brown, according to his personal records, totalled $700.00. The Court concludes that KIC owed Brown $12,000.00 in salary for the six month period he worked and that, apparently, the $700.00 cash Brown received was for expenses. Since the total of pay checks he received ($10,-500.00), and the value of the mopeds ($1,100.00) does not equal nor exceed $12,-000.00, KIC is indebted to Brown for at least $400.00. Thus, Brown has a claim against KIC and will be allowed to join as an intervening creditor in this case.

■ Having concluded that the requisite number of creditors have joined the petition to commence an involuntary case, namely KW, the Alversons and Daniel Brown, the question presented is whether KIC is generally paying its debts as they become due pursuant to Section 303(h)(1). As stated in House Report No. 95–595, 95th Cong., 1st Sess. (1977) 323–324, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6280.

"(The Test of Section 303(h)(1)) . . . represents the most significant departure from present law concerning the grounds for involuntary bankruptcy, which requires balance sheet insolvency and an act of bankruptcy. This bill abolishes the concept of acts of bankruptcy. The only basis for an involuntary case will be the inability of the debtor to meet its debts.

The equity insolvency test has been in equity jurisprudence for hundreds of years and though it is new in the bankruptcy context (except in Chapter X), the bankruptcy courts should have no difficulty in applying it."

Obviously, the House Report could not envision the complex and controverted condition of this case, evidenced by voluminous discovery and lengthy trial, when it predicted an easy application of the new insolvency standard.

KIC *is* apparently paying debts such as rent and operating expenses while ignoring the alleged debt claimed due and owing by KW. If indeed KW's claim is valid, it would constitute over ninety-seven percent of KIC's debt. Accordingly, the Court concludes that KIC would not generally be paying its debts if it has failed to make payments on a debt which constitutes such a large percentage of the company's total debt.

The final major issue to be addressed, therefore, is whether KW's claim against KIC is valid. An affirmative answer would require the Court to order relief against KIC because the language of Section 303(h) is mandatory.

The factual circumstances surrounding the genesis of KW's claim can be summarized as follows: In August, 1976 KW and KIC entered into a contract whereby KIC was granted the exclusive right to distribute Kreidler mopeds in the United States. (Plaintiff's exhibit 17, page 21). Thereafter, KW shipped mopeds to KIC and at first KIC paid timely according to the agreement. By June, 1977 KIC was already losing over $100,000.00. (Plaintiff's exhibit 17, page 19). KIC established through expert testimony that the Kreidler moped, a superior product, was overpriced to the extent that in the experts' opinions it would be very difficult to market. However, KIC was successful in establishing Kreidler moped dealers throughout the United States.

According to the experts, very alarming signals began to surface in the moped market in late 1977. By mid 1978, the bottom had fallen out of the market, and many dealers and importers were faced with warehouses full of distressed merchandise. During this period, KIC was continuing to advertise aggressively, attend trade shows and successfully consummate new dealership agreements. During the year ending August 31, 1978, KIC suffered a net loss of over $155,000.00. (Plaintiff's exhibit 4, page 13 of Plaintiff's exhibit 17). During this period, Philip Poling, KIC's president continuously communicated the financial condition of KIC to KW officials. Despite Poling's repeated requests, KW raised the prices on the Kreidler mopeds at least twice during 1977 and 1978. In early 1978 negotiations began between Poling and KW representatives with the purpose of forming a joint venture or partnership between KIC and KW to distribute Kreidler mopeds in the United States. (The unsigned draft of the proposed agreement appears in defendant's exhibit 5 on the unnumbered page following page 113). As evidence by pages 38–55 of defendant's exhibit 5, Poling had been negotiating with two Washington attorneys to join him as principals in KIC. However, when KW indicated that it was interested in participating in the new company as a major stockholder, the discussions with KW replaced negotiations with the attorney-investors. Poling testified that the outstanding debt of KIC to KW would be converted to equity in the new partnership or joint venture. (Plaintiff's Excerpts of Deposition Evidence, part 1, page 289, hereinafter cited as Plaintiff's excerpts).

During these negotiations, KW was represented by, and Poling dealt with the following persons: Heinrich Keim, in charge of the divisional management of the division of motorcycles; Edgar Schmeinch, Keim's subordinate who was head of the motorcycle distribution branch; Friedrich Kimmerle, also a subordinate of Keim who headed the export sales office, and Kimmerle's assistant Peter Grimm. Although Poling never met him, Alfred Kreidler is and was the "Gesellschafter" (similar to president) of KW. The negotiations could not be completed, nor an agreement finalized withhout Alfred Kreidler's approval. The transaction of handwritten notes, dated September 29, 1978 indicate that the new partnership proposition would be submitted to Alfred Kreidler. (Defendant's exhibit 5, page 58). Telex number 817 states that the discussions between Schmeinck and Alfred Kreidler would be suspended during the Christmas holidays of 1978 (Id., page 59), and telex number 841 informed Poling that communication on the partnership agreement had been postponed due to Alfred Kreidler's illness. (Id., page 60). Kimmerle stated that negotiations could resume in mid-February, 1979. (Id.). The translation of handwritten notes dated February 28, 1979 indicate that Alfred Kreidler was still unavailable to approve the proposed partnership agreement at that time. (Id., page 78). Telex 930, also dated February 28, indicates that KW could not obtain the requisite approval as planned and encouraged Poling to negotiate with other investors. (Id., page 76). Apparently, such other negotiations proved unsuccessful, (Id., pp. 81 and 89), and by June, 1979, Poling was again attempting to consummate a partnership agreement with KW. (Id., page 98).

During these various negotiations, KIC had been receiving shipments of mopeds and in telex 900 (defendant's exhibit 5, page 68), and telex 903 (plaintiff's exhibit 18) KW began demanding payment. In a letter dated March 1, 1979, KW set out a payment schedule which required KIC to pay certain amounts each month to cover unpaid invoices. (Plaintiff's exhibit 17, pp. 51, 53.) Poling's reply, by letter dated March 27, 1979, asked that the first payment on the schedule be postponed forty-five days. (Plaintiff's exhibit 17, page 55, 56.) The letter states, "The balance of the remaining mopeds in the United States, we feel, can be fully paid within the scope of your program but only one month later, the date being June 31 (sic), 1979." (Id. at 56). KW agreed to postponing the payment schedule in its reply telex. (Id., page 60).

On May 31, 1979, Poling sent Kimmerle telex 229 ordering seven containers of mopeds. Between June 4 and June 7, 1979 Poling visited KW in Germany. Originally, Poling had expected his new partners to accompany him, but they had decided not to invest. KW alleges, and Poling's letter of March 27, 1979, quoted above, supports the allegation that Poling was to have paid KW approximately $500,000.00 by June 30, 1979 for past due invoices, but Keim's handwritten memorandum detailing Poling's June visit indicates that payments for shipments made before May 31, 1979 would be made on August 15, 1979, August 30, 1979 and September 15, 1979. (Defendant's exhibit 5, page 92). Apparently, the extension of time was granted because of Poling's inability to secure interested investors.

During the June visit, arrangements were made for the payment of the seven containers ordered on May 31, 1979. Poling signed seven blank acceptances similar to drafts which he testified were never to be presented but were merely a measure to comply with German customs law. However, Keim's written notes on the Poling visit indicate that his understanding was that the terms of payment were ninety (90) days after customs clearance, that the acceptances would be filled in and executed after the customs data was received and that in order to save the parties the expense of negotiating the drafts, Poling would pay the amounts covered fourteen (14) days before the acceptance was due and payable. (Defendant's exhibit 5, pp. 90–91). The memorandum states, "P. has taken on the obligation of sending us a check for the amount of the acceptance 14 days prior to the due date. We will receive, by telex, the container number, the check number and the amount in D M. *If these checks should not arrive in time, we can still submit the acceptances."* (*Id.* at 91, emphasis supplied.)

By letter of June 12, 1979 Poling confirmed that, "(A)dditional mopeds shipped in ensuing months will be paid for through drafts on the Riggs Bank, payable ninety (90) days after U.S. Customs clearance. In the event funds are available from accounts receivable up to fifteen (15) days before issuance of draft, the funds for each draft can be transferred to Kreidler Werke GmbH, thus eliminating draft costs for both parties." (*Id.*, at 95). KIC, in its post trial memorandum, alleges that Poling was alluding to shipments *after* June, and not to the seven containers discussed at the June visit. However, in view of the Keim memorandum, the ambiguity of Poling's letter and the fact that the invoices for each of the seven containers contain the statement "*Payment:* by 90 days sight draft," the Court concludes that the parties intended that the seven containers would, indeed, be paid for by utilizing the drafts. (Invoices: Plaintiff's exhibit 17 at 63, 69, 75, 78, 85, 91, 97, 104).

Apparently, Poling was still attempting to induce KW to form a partnership as evidenced by his telex of June 22, 1979, (Defendant's exhibit 5 at 98), and he felt that the debt for the seven containers together with the outstanding debt for the prior invoices would be subsumed by the consummation of such an agreement. No agreement was ever finalized, however, and KW presented the executed drafts for payment of the seven containers. When the bank refused payment, KW filed this action.

The Court concludes that no finalized agreement was ever consummated, and the result of the aborted negotiations is that the debt for the seven containers, as well as the prior shipments is now due. Since KIC has neglected to pay this debt, which constitutes over ninety-seven percent of its total obligations, the Court is bound by Section 303 to enter an order for relief against KIC.