**In the Matter of LUFTEK, INC., Alleged Debtor.**

**Bankruptcy No. 880–00481–17.**

United States Bankruptcy Court, E. D. New York.

Oct. 8, 1980.

Marcus & Angel, New York City by Peter D. Wolfson, New York City, for petitioning creditors.

Meyer, Unkovic & Scott, Pittsburgh, Pa. by Frederick J. Francis, Pittsburgh, Pa., for petitioner Schneider, Inc.

Nydick & Ross, Melville, N. Y. by Allan E. Ross, Melville, N. Y., for alleged debtor; Holland & Zinker, Smithtown, N. Y. by Marvin A. Holland, Smithtown, N. Y., of counsel.

BORIS. RADOYEVICH, Bankruptcy Judge.

The petitioning creditors, Charlestown Welding & Engineering Co. ("Charlestown"), John N. Fehlinger Co. ("Fehlinger"), and Steco Engineering Corp. ("Steco"), commenced this involuntary proceeding by filing a petition against the alleged debtor Luftek, Inc. ("Luftek") on January 31, 1980, under 11 U.S.C. section 303. Following the denial of its motion to dismiss, the alleged debtor filed an answer which denies all of the material allegations of the complaint, interposes three affirmative defenses,[1] and

---

[1.] The first affirmative defense is that Luftek is not indebted to the petitioner Charlestown because of an alleged accord and satisfaction. The second affirmative defense alleges a similar accord and satisfaction with respect to the petitioner Steco. The third affirmative defense alleges that the petitioner Charlestown is owned or controlled by Dometco Systems, Inc. ("Dometco"), that Dometco is a competitor of Luftek, that Dometco has engaged in certain unfair trade practices in derogation of the alleged debtor's rights, that Dometco induced the petitioner Fehlinger to join in the petition by falsely representing that those who did not join in the petition would be the last in line for payment, and that the petition should be dismissed because it is a sham and was filed in bad faith. The answer also demands costs, attorneys' fees, and compensatory and punitive damages in accordance with section 303(i) of the Code.

The alleged debtor moved during trial to dismiss the petition on the ground that it was not filed by at least three entities holding non–contingent unsecured claims totalling at least $5,000.00. See 11 U.S.C. § 303(b)(1). This motion, which was based in part on the first two affirmative defenses, was denied. Transcript of July 16, 1980, at 334. Implicit in this Court's decision to deny the motion is the finding that the petitioning creditors hold at least three non–contingent unsecured claims against the alleged debtor totalling at least $5,000.00. The record amply supports the conclusion, without regard to the claims of the petitioners, that the alleged debtor is not generally paying its debts as they mature. In view of this, it would be inefficient and unjust to make specific findings and reach specific conclusions on the merits of each of the petitioners' claims. Doing so could collaterally estop the parties in subsequent litigation in which these claims are

demands an award for costs, attorneys fees and damages under 11 U.S.C. section 303(i). Schneider, Inc. ("Schneider") joined the involuntary petition by filing a petition for intervention on March 17, 1980, in accordance with 11 U.S.C. section 303(c). By a motion filed on July 7, 1980, the alleged debtor asks this Court to decline to exercise jurisdiction over this involuntary proceeding under section 305(a) of the Code, 11 U.S.C. section 305(a), on the ground that the interests of creditors and the debtor would be better served by abstention.[2] A trial of the involuntary case was begun on July 9, 1980, and concluded on July 28, 1980, at which time a hearing was held on the alleged debtor's request for abstention. Decision was reserved to consider whether the alleged debtor is generally paying its debts as they become due, and whether the Court should dismiss the petition under 11 U.S.C. section 305(a). For reasons which follow, the Court has determined that the interests of creditors and the debtor would be better served by abstention.

## FINDINGS OF FACT

1. Luftek was incorporated in 1975 under the laws of the State of New York, and has been engaged in the business of heavy construction of smoke stacks, components and related equipment which are designed to facilitate compliance with environmental laws and regulations.

2. Luftek was dissolved by proclamation of the New York State Secretary of State in December of 1979.[3]

---

both the subject matter and the center of attention. *See Myers v. International Trust Co.*, 263 U.S. 64, 44 S.Ct. 86, 68 L.Ed. 165 (1923); *In re All Media Properties, Inc.*, 5 B.R. 126, 6 B.C.D. 586 (Bkrtcy.S.D.Tex.1980); 2 Collier on Bankruptcy § 18.43[2] at 177 (14th ed. 1976). Moreover, assuming that an order for relief might be entered, protracted litigation of the petitioners' claims would have the undesirable effect of prolonging the administration of the estate. *See* I Report of the Commission on the Bankruptcy Laws of the United States 186–190 (1973).

**2.** On the eve of trial, the petitioners obtained an order to show cause why they should not be permitted to amend the caption of their petitions to read "Luftek, Inc., a/k/a East Coast Fabrikators & Erektors, Inc." The order to show cause was served only on the attorneys for Luftek, and was not heard until the first day of the trial herein. Counsel contended–and it was later established at trial–that Luftek, Inc., is a wholly owned subsidiary of East Coast Fabrikators & Erektors, Inc. ("East Coast"). The Court denied the petitioners' application. Transcript of July 9, 1980, at 13–22. *See Skehan v. Board of Trustees*, 590 F.2d 470 (3d Cir. 1978), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979).

**3.** On the third day of trial, counsel for the petitioners introduced into evidence a tax status report from the Corporation Tax Bureau of the New York State Department of Taxation and Finance. Transcript of July 16, 1980, at 334; Petitioners' Exhibit XL. This tax search indicates that as of the July 15, 1980, search date, Luftek owed franchise taxes for the reporting periods ending March 31, 1976, through March 31, 1980. In addition, the search indicates that Luftek was dissolved by proclamation of the New York Secretary of State in December of 1979. *See* N.Y. Tax Law § 203–a (McKinney 1966 & Supp.1980). Section 203–a of the New York Tax Law prescribes certain procedures by which the proclamation may be annulled, and provides that the corporation shall have all of the powers, rights, duties and obligations as it had on the date of dissolution if the proclamation is annulled. Nothing in the record indicates that these taxes have been paid since the date of the search, or that any action has been taken to annul the Secretary of State's proclamation. Therefore, it must be assumed that the corporation was dissolved in December of 1979, and that it was dissolved on January 31, 1980, when the involuntary petition was filed herein. Section 203–a(10) provides that in the event that a corporation governed by the New York Business Corporation Law ("BCL") is dissolved, section 1009 of the BCL shall apply to such corporations. This section, in turn applies section 1006 of the BCL to such corporations. Section 1006 provides that a dissolved corporation may continue to function for the purpose of winding up the affairs of the corporation as if the dissolution had not taken place, that title to assets will remain in the corporation, that the corporation may sue or be sued in all courts in its corporate name, that process may be served upon it, and that dissolution shall not affect any remedy available to or against the corporation for any right or claim existing or any liability incurred before such dissolution. Moreover, it is clear that federal courts may obtain jurisdiction over a dissolved corporation. *United States v. Garfunkle*, 52 F.2d 727 (2d Cir. 1931); *Display Stage Lighting Co. v. Century Lighting, Inc.*, 41 F.Supp. 937 (S.D.N.Y.1941). It is also clear that a dissolved corporation may be a debtor under chapter 7 of the Bankruptcy Code, 11

3. On January 31, 1980, an involuntary chapter 7 petition was filed against Luftek by Charlestown, Fehlinger, and Steco.

4. On March 17, 1980, Schneider joined the involuntary petition by filing a petition for intervention.

5. Luftek is a wholly–owned subsidiary of East Coast Erektors & Fabrikators, Inc. ("East Coast"), and has been since its inception.

6. Alfons O. Krautz is the President of Luftek, and has been since its inception. In addition, he owns 100 percent of the stock of East Coast and is its President.

7. Alfons O. Krautz has a specialized engineering degree in the industry in which Luftek works. This degree was from the University of Stuttgart in West Germany. He has had substantial experience in the design and construction of smoke stacks, components, and related equipment. He has been involved in between one hundred and two hundred contracts for the construction of chimneys and related air pollution equipment. He has patent applications for four stacks. Transcript of July 16, 1980, at 373–74.

8. Alfons O. Krautz is sufficiently familiar with the industry in which Luftek operates to qualify as an expert in this industry. In particular, he is qualified to estimate the cost to complete contracts which have been partly performed by Luftek.

9. Luftek has virtually no assets.

10. At all times relevant hereto, Luftek and East Coast have maintained one consolidated set of books and records. Some of the obligations listed in these books and records are obligations of Luftek, Transcript of July 28, 1980, at 419–21; although no indication of this is made in the books and records. Transcript of July 9, 1980, at 28–32, 60, 128.

11. Luftek and East Coast have used the accrual basis as their methodology of accounting.

12. A consolidated statement of financial condition for Luftek and East Coast, dated December 31, 1979, indicates, and the Court finds, that these two corporations had accounts payable of $332,244.00. In addition, this statement indicates a $461,420.00 indebtedness for the current portion of long term debt, and a $198,916.00 indebtedness for "payroll and other taxes payable." Petitioners' Exhibit I.

13. A consolidated accounts payable schedule of Luftek and East Coast, dated January 31, 1980, indicates, and the Court finds that these two corporations had 146 trade creditors on that date, and an indebtedness to trade creditors of $492,019.72. Of this amount, $330,845.14 had been owed for 120 days or more, $19,648.32 had been owed between 90 and 120 days, $15,741.10 had been owed between 60 and 90 days, and $131,605.16 had been incurred within 60 days of January 31, 1980. Some of the $492,019.72 total was in dispute. Transcript of July 9, 1980, at 83.

14. Bills which are kept in the normal course of Luftek's business indicate, and the Court finds, that several of these accounts payable represent debts of Luftek.

15. Included with these bills were invoices and collection letters indicating that Luftek's debts are not being paid. These bills and letters are from Luftek's trade creditors, including: Eastern Fastener; Vaughan Co.; the National Association of Credit Management on behalf of Industrial Belting and Supply Co.; Goldbert & Epstein, C.P.A.s (together with a summons); Ranor, Inc., United Credit Services on behalf of the N.E. Bolt Co.; Kogel Lumber & Supply, Inc., Morse–Boulger, Inc.; Smyth, Oburachay & Halloran, Esq., on behalf of Hallamore Motor Trans., Inc.; United Credit Services on behalf of the H.B. Fuller Co.; Fay Portable Buildings, Inc.; Bruhnke & Silver Collection Agency on behalf of Dravo

U.S.C. § 109(b), and may be the subject of an involuntary chapter 7 case. 11 U.S.C. § 303(a). Certainly, bankruptcy liquidation is not inconsistent with continued existence under section 1006 of the BCL for purposes of winding up the affairs of the corporation. Accordingly, the Court denied the alleged debtor's motion to dismiss the petition which was made on the ground that the alleged debtor had been dissolved. See Transcript of July 16, 1980, at 334.

Doyle; Donora Construction, Inc.; Cryo Dyne Corp.; New England Association of Credit Executives on behalf of Colony, Inc.; Cahill & Shea, Esqs., on behalf of Children's Inn; Cassel G.M.C. Truck Sales Corp.; Bi-State Crane Service, Inc.; Dun & Bradstreet's Commercial Collection Division on behalf of Bud's National Permit Service; I.C. System, Inc., a collection agency, on behalf of the Charlie Bowlby Oil Co., Inc.; Olori Crane Service, Inc.; Alfred Pumford & Sons, Inc.; Robinson Petroleum Co.; and Parson–Bishop National Collections, Inc., on behalf of Superior Oxy–Acetylene.

16. Luftek and East Coast maintained a file which, as a general rule, contained approximately 100 unpaid bills. Alfons Krautz, the alleged debtor's President, would periodically select some of these bills for payment while the others remained unpaid.

17. The alleged debtor's bookkeeper received one or two "dunning" phone calls each day from creditors of Luftek and East Coast.

18. Over the past two years, neither the alleged debtor nor East Coast have maintained sufficient funds in their operating accounts to pay their debts as they matured.

19. For approximately the past two years, Luftek has assumed payroll responsibilities for persons employed by Luftek and East Coast. Returns for payroll taxes, however, were filed by East Coast alone.

20. As of January 31, 1980, Luftek owed approximately $200,000.00 in federal and state payroll taxes. Of this amount, approximately $133,417.00 had become due on March 31, 1979. A check in the approximate amount of $83,417.00, which was drawn by Luftek in April of 1980 and made payable to the Internal Revenue Service, was returned by Luftek's bank for insufficient funds. Some of these taxes were paid late in the Spring of 1980, while some remained unpaid as of the date of trial.

21. Luftek did not file a franchise tax report with the New York State Department of Taxation and Finance for the periods ending March 31, 1978, through March 31, 1980. Luftek owes franchise taxes of an undisclosed amount for the periods ending March 31, 1976 through March 31, 1980.

22. On January 31, 1980, Luftek's operating account with Bankers Trust was overdrawn by $22,529.87.

23. Luftek is liable to Bank Hapoalim as a guarantor of a defaulted loan to East Coast and an overdraft by East Coast, in the amount of $353,000.00, plus interest and attorneys' fees. East Coast's overdraft was approximately $73,000.00. Bank Hapoalim has commenced an action in state court to recover these debts from Luftek and East Coast.

24. The books and records of Luftek and East Coast showed a deficit in cash in the bank of $161,642.00 on January 31, 1980, and $256,607.00 on March 31, 1980, indicating that checks had been drawn and issued in such amounts without sufficient funds in the bank to pay them. These amounts include the Bank Hapoalim overdraft. Transcript of July 14, 1980, at 236–37.

25. In July of 1980, thirty of Luftek's creditors indicated their consent to Luftek's petition for abstention under 11 U.S.C. § 305(a). Several of these creditors are listed in the January 31, 1980, accounts payable schedule for amounts which are less than or equal to the amounts claimed in their July, 1980 communications to this Court. The thirty Luftek creditors state that they have claims against Luftek in the amount of $792,318.40.

26. When the alleged debtor's President felt that Luftek was "short of money," he did not pay his own salary.

27. After March of 1977, petitioner Charlestown and Luftek had no further correspondence concerning the claim asserted by Charlestown in the petition. Charlestown and Luftek continued to do business with each other after this time. In 1978 and 1979, these two parties completed two contracts with each other. Charlestown paid Luftek in full without asserting a set off, although it had opportunities to do so. Transcript of July 14, 1980, at 300–04; Transcript of July 16, 1980, at 385–400.

28. Dometco Systems, Inc. ("Dometco"), was and is a competitor of Luftek. Petitioner Charlestown became a subsidiary of Dometco in March of 1979. *Id.*; Transcript of July 14, 1980, at 301–02.

29. Jack Carty was employed by Luftek from 1975 to 1979, and was made a Vice President of the firm. Carty began to solicit business for Dometco in March of 1979, while he was still employed by Luftek. When confronted by Alfons Krautz, Carty informed Krautz that he would soon begin working for Dometco. Krautz relieved Carty of his title of Vice President in May of 1979, but retained Carty on the Luftek payroll until August of 1979. Transcript of July 28, 1980, at 386–90, 412.

30. Alfons Krautz complained of Carty's conduct to B.P. Viradia, the President of Dometco, in July of 1979. Viradia suggested, and Krautz agreed, that Dometco and Luftek should undertake certain contracts solicited by Carty as joint venturers. *Id.* at 388–400.

31. Luftek began working with Dometco on one of the contracts undertaken by them as joint venturers, but stopped work when a dispute occurred.

32. B.P. Viradia signed the telegram which authorized counsel for the petitioning creditors to sign the petition on behalf of Charlestown.

33. Petitioner Schneider has been litigating one of its claims against Luftek in an Iowa Court.

34. A bona fide dispute exists with respect to the claim of petitioner Steco.

35. Petitioner Fehlinger has recanted in the allegation, recited in the January 31, 1980, petition, that it had a claim against Luftek in the amount of $17,891.00 on that date. Its claim against Luftek on January 31, 1980, did not exceed $2,500.00 Transcript of July 28, 1980, at 461–62.

36. Luftek's management wishes to continue in business.

37. Luftek and a lending institution have executed a commitment for a loan which would provide Luftek with sufficient funds to pay its creditors in full and arrange its affairs. Luftek's management intends to use the proceeds of the loan for these purposes. The loan commitment is contingent upon dismissal or suspension of these proceedings.

38. Luftek has a contract with the D.C. General Hospital. Construction is complete on this project. Luftek is obligated to provide additional manpower for approximately one year for the seasonal adjustment of the equipment which it incorporated into the project. Luftek has a receivable of approximately $150,000.00 as a result of work performed on this contract to date. Recovery of this amount will be jeopardized if Luftek does not fulfill its remaining obligations, since the cost to complete the contract would be greater if the work is done by someone other than Luftek. Transcript of July 28, 1980, at 479–81.

39. Luftek has a contract with the Three Rivers Hydramatic Division of the General Motors Corporation to construct a stack and breeching. The contract price is $190,000.00. Luftek has been paid approximately $140,000.00 for work performed on this contract to date, and has a receivable of approximately $50,000.00. The cost to complete this contract would be approximately $5,000.00 for Luftek. The cost to complete this contract would be approximately $60,000.00 to $70,000.00 for an outside contractor. Recovery of this receivable will be jeopardized if Luftek does not fulfill its remaining obligations under the contract.

40. Luftek has a contract with the Pontiac General Hospital to supply a stack and breeching. The contract price is approximately $80,000.00. Luftek has been paid approximately $65,000.00 to $70,000.00 for work performed on this contract to date. Upon completion, Luftek would have a receivable of approximately $20,000.00. The cost to complete this contract would be a few hundred dollars for Luftek. In addition, Luftek is obligated to provide additional manpower for five years, for start up and seasonal adjustment of the equipment. The cost to complete this contract would be

approximately $25,000.00 to $35,000.00 for an outside contractor. Luftek's recovery of further payments would be jeopardized if the project is completed by an outsider. Transcript of July 28, 1980, at 483–88.

41. Luftek has a contract with the Truck and Coach Division of the General Motors Corporation to supply a stack and breeching. The contract price is $120,000.00. Some of the work has been completed by Luftek and its subcontractor. Additional construction and start up obligations have yet to be fulfilled. Luftek has not been paid for any of its work on this project. The cost to complete the project would be approximately $85,000.00 for Luftek, and some greater amount for an outsider. Recovery of Luftek's receivable would be jeopardized if it did not complete work on this project.

42. Luftek has a contract with the Federal Railroad Administration for the replacement of rivets and steel on the Connecticut River Bridge. The contract price is $3,800,000.00. Luftek has been paid approximately $600,000.00 for work performed to date. The potential receivable on this contract would be $3,200,000.00. The cost to complete would be approximately $1,700,000.00 to $1,800,000.00 for Luftek. The cost for the next highest bidder on this project to complete the contract would exceed Luftek's cost to complete, thereby eliminating any possibility of a recovery by Luftek.

43. Luftek has a contract with the General Motors Corporation for the construction of two stacks and breeching in connection with an assembly plant. The contract, which was awarded after competitive bidding, has a price of approximately $1,500,000.00. Luftek has been paid approximately $70,000.00 for engineering services which it has supplied to date. The potential receivable on this contract is approximately $1,420,000.00. The cost to complete this project would be approximately $1,015,000.00 to $1,040,000.00 for Luftek. If Luftek is unable to complete this project, it would be likely to lose any profit which it might otherwise realize.

44. Luftek has a contract with the New York City Department of Sanitation for the design, manufacture and erection of air pollution equipment. The contract, which was awarded after competitive bidding, has a price of $2,135,000.00. Luftek's work under the contract is approximately 40 percent complete, and its cost to complete the project is approximately $1,400,000.00 to $1,500,000.00. The cost to another contractor to complete the project would exceed this amount, thereby resulting in a loss of profits for Luftek.

45. Administration expenses would be likely to consume the entire estate of the alleged debtor in the event that Luftek becomes a debtor under chapter 7 of the Bankruptcy Code. A dividend for unsecured creditors is unlikely.

46. The interests of creditors and the debtor would be better served by dismissal or suspension of these proceedings under 11 U.S.C. § 305(a).

### CONCLUSIONS OF LAW

1. Luftek is not generally paying its debts as they become due.

2. The interests of creditors and the debtor would better be served by dismissal under 11 U.S.C. § 305(a).

3. The petition should be dismissed under 11 U.S.C. § 305(a).

### I.

In adopting the Bankruptcy Reform Act of 1978, Congress abandoned traditional standards for an involuntary adjudication in bankruptcy, i. e., balance sheet insolvency and an act of bankruptcy, and replaced it with the so-called equity insolvency test. H.R.Rep.95–595, 95th Cong., 1st Sess. 323–24 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787; S.Rep.No.95–989, 95th Cong., 2d Sess. 34 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. The equity insolvency test is a simple test which has been a part of the bankruptcy laws for many years. It was incorporated in sections 323, 423 and 623 of the Bankruptcy Act as a part of the criteria to determine who was

eligible to be a debtor under the Act's reorganization chapters. It has been referred to as "insolvency in the ordinary business sense." 8 Collier on Bankruptcy §§ 321–324 at 390 (14th ed. 1978), *citing In re Schulte Retail Stores Corp.*, 22 F.Supp. 612 (S.D.N.Y.1937). It has been said to encompass the situation of a solvent debtor with cash flow problems as well as that of the debtor who is insolvent according to its balance sheet. *See In re Castle Village Co.*, 3 B.C.D. 588, 593 (S.D.N.Y.1977). Some courts have adopted the view that the equity insolvency test is met if the debtor is not paying a substantial part of its total debt, without regard to the number of creditors who are not being paid. *E. g., In re Kreidler Import Corp.*, 4 B.R. 256, 6 B.C.D. 608 (Bkrtcy., D.Md.1980). The view of this Court is that both the number and amount of unpaid claims should be considered in determining whether non–payment of debt is the alleged debtor's regular course of conduct. *See In re Hill*, 5 B.R. 79, 6 B.C.D. 659 (Bkrtcy., D.Minn.1980); *In re All Media Properties, Inc.*, 5 B.R. 126, 6 B.C.D. 568 (Bkrtcy., S.D.Tex.1980); *In re Trans–High Corp.*, 3 B.R. 1, 6 B.C.D. 213 (Bkrtcy., S.D.N.Y.1980). In any event, the test is met if the debtor is unable to pay its debts or simply is not paying its debts as they mature.

In the present case, there is substantial evidence that the debtor is not generally paying its debts as they become due. An accounts payable schedule with aging shows that on January 31, 1980, Luftek and East Coast had 146 trade creditors who had been owed $330,845.14 for 120 days or more. This figure is disproportionately high when compared to the $19,648.32 which had been owed for between 90 and 120 days, the $15,741.10 which had been owed for between 60 and 90 days, or even the $131,605.16 which had been incurred within 60 days of January 31, 1980. Although some of these accounts represented obligations of East Coast, many were Luftek's obligations. Indeed, in the process of indicating their consent to the alleged debtor's motion for abstention, twenty–nine creditors indicated that they were creditors of Luftek in July, 1980, and that they were owed a total of $439,318.40. A thirtieth consenting creditor, Bank Hapoalim, holds a claim against Luftek in the amount of $353,000.00, as a result of Luftek's guarantee of a note upon which East Coast defaulted in February of 1979.

The alleged debtor's bookkeeper testified that Luftek and East Coast received a few dunning calls from bill collectors each day. The alleged debtor's bookkeeper and its former accountant both testified that at any given time there would have been approximately 100 unpaid bills in the file which was jointly maintained by Luftek and East Coast, that as a general practice, Mr. Krautz would periodically select some of the past due bills for payment while leaving others unpaid, and that as a general rule there were not sufficient funds in the operating accounts to pay all the past due bills. On January 31, 1980, Luftek's general operating account at Bankers Trust was overdrawn by $22,529.87.

For approximately the past two years, Luftek has assumed payroll responsibilities for employees who were shared by Luftek and East Coast. Although payroll tax returns have been filed by East Coast alone, the Internal Revenue Code imposes the liability for such taxes upon the entity having control over the payroll. I.R.C. § 3401(d). *See Educational Fund of the Electrical Industry v. United States*, 426 F.2d 1053 (2d Cir. 1970); *United States v. Falino*, 441 F.Supp. 153 (E.D.N.Y.1977). Parallel provisions of law exist in New York State. *See* N.Y.Tax.Law §§ 671–678 (McKinney 1966 & Supp.1980). As of January 31, 1980, Luftek owed approximately $200,000.00 in federal and state payroll taxes. Of this amount, a total of approximately $133,417.00 had become due on March 31, 1979. A check in the approximate amount of $83,417.00, which was drawn by Luftek in April of 1980 and made payable to the Internal Revenue Service, was returned by Luftek's bank for insufficient funds. Some of these taxes were paid in late spring, 1980, and some remained unpaid as of the date of trial. Luftek did not file a franchise tax report with the New York State Depart-

ment of Taxation and Finance for the periods ending March 31, 1978 through March 31, 1980, and owes franchise taxes of an undisclosed amount for the periods ending March 31, 1976 through March 31, 1980. Indeed, the New York State Secretary of State issued a proclamation dissolving Luftek as a New York corporation in December of 1979.[4]

In addition, the petitioners introduced into evidence a number of past due bills and collection letters addressed to Luftek from its trade creditors, including: Eastern Fastener; Vaughan Co.; the National Association of Credit Management on behalf of Industrial Belting and Supply Co.; Goldbert & Epstein, C.P.A.s (together with a summons); Ranor, Inc., United Credit Services on behalf of the N.E. Bolt Co.; Kogel Lumber & Supply, Inc., Morse–Boulger, Inc.; Smyth, Oburachay & Halloran, Esq., on behalf of Hallamore Motor Trans., Inc.; United Credit Services on behalf of the H.B. Fuller Co.; Fay Portable Buildings, Inc.; Bruhnke & Silver Collection Agency on behalf of Dravo Doyle; Donora Construction, Inc.; Cryo Dyne Corp.; New England Association of Credit Executives on behalf of Colony, Inc.; Cahill & Shea, Esqs., on behalf of Children's Inn; Cassel G.M.C. Truck Sales Corp.; Bi–State Crane Service, Inc.; Dun & Bradstreet's Commercial Collection Division on behalf of Bud's National Permit Service; I.C. System, Inc., a collection agency, on behalf of the Charlie Bowlby Oil Co., Inc.; Olori Crane Service, Inc.; Alfred Pumford & Sons, Inc.; Robinson Petroleum Co.; and Parson–Bishop National Collections, Inc., on behalf of Superior Oxy–Acetylene. All of the aforementioned bills or letters, which are described as a sample of the many other bills in the unpaid bill file of Luftek and East Coast, include notations to the effect that they are past–due obligations of Luftek. These bills and letters also confirm that a number of the creditors listed on the aforementioned accounts payable schedule are creditors of Luftek and not East Coast.

▉ In view of the foregoing, there is substantial evidence to support the conclusion that as to number or amount, Luftek is not generally paying its debts as they become due.

## II

▉ The alleged debtor has moved this Court for an order dismissing the petition under Code section 305[5] on the ground that the interests of creditors and the debtor would be better served by dismissal. *See* 11 U.S.C. § 305(a)(1). In support of this motion, the alleged debtor points to the fact that many of its creditors have consented to its motion, that it would lose a substantial amount of its receivables if it is forced out of business as a result of bankruptcy liquidation, that the petition was joined by the subsidiary of one of its competitors, and that it has entered into a commitment for a loan which would enable it to privately reorganize its debts and pay its creditors in full.

Section 305(a) of the Code is without a counterpart in Bankruptcy Act. The sparse legislative history accompanying this section suggests only that

[t]he court may dismiss or suspend under the first paragraph, for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to exact full payment.

---

4. *See* note 3 *supra*.

5. Section 305 of the Bankruptcy Code provides (in part):

The Court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension; or

(2)(A) there is pending a foreign proceeding; and

(B) the factors specified in section 304(c) of this title warrant such dismissal or suspension.

11 U.S.C. § 305(a).

H.R.Rep.No.95–595, 95th Cong., 1st Sess. 325 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6281; S.Rep.No.95–989, 95th Cong., 2d Sess. 35 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. *See generally* 2 Collier on Bankruptcy ¶ 305.02 (15th ed. 1979).

All of the factors identified in the Code's legislative history are present in this case. Petitioner Charlestown is now a subsidiary of the alleged debtor's competitor, Dometco. The claim which it asserts in the petition arose from dealings which it had with Luftek in 1976. It is a claim which the petitioner could have asserted as a set off during subsequent transactions with Luftek, but one which was not asserted until Dometco's joint venture with Luftek went sour. Petitioner Schneider is presently embroiled in litigation with Luftek in an Iowa court concerning one of the two claims which it asserts in the petition. A bona fide dispute exists with regard to these claims as well as the relatively small claims of petitioner Steco. Petitioner Fehlinger recanted in its allegation that its claim amounted to $17,-891.00 on January 31, 1980. Fehlinger's Vice President indicated at trial that its claim did not exceed $2,500.00 on January 31, 1980. Moreover, Fehlinger has indicated its consent to Luftek's motion for abstention. These facts indicate that the petition was filed by a group of recalcitrant creditors.

Clearly, the interests of creditors would be better served by dismissal. There is no dispute that administration expenses would consume the meager assets of this debtor in the event that bankruptcy liquidation takes place. It also appears that Luftek's unsecured creditors have claims in excess of $700,000.00, which would be discharged without payment of any dividends. In contrast, the alleged debtor has shown its willingness to pay these creditors in full by entering into a loan commitment; the loan would be secured by the personal assets of the debtor's president. Moreover, the alleged debtor's President has testified that Luftek has potential receivables as a result of contracts which are only partially performed by Luftek. If Luftek or its trustee were to disaffirm these contracts, as a result of bankruptcy liquidation, most or all of these receivables would be lost. *See* 11 U.S.C. §§ 365, 502(g). With or without the loan commitment, it is apparent that the best interests of creditors and the debtor would be better served by dismissal under section 305(a).

It also is apparent that the courts will have to exercise great care in using the discretion granted by section 305(a) to dismiss a case. To be sure, it could be said that dismissal would be in the interests of creditors and the debtor in many of the proceedings commenced under the Bankruptcy Code; this Court could dispose of much of its calendar if its discretion was unbridled. There is an inherent risk to our system of jurisprudence in any Act of Congress which gives the courts such broad powers to refuse jurisdiction over a case. This risk is compounded by the finality and non–appealability of an order entered under this section. Indeed, by giving an example of a situation in which abstention or dismissal would be appropriate, Congress has indicated that it intended section 305(a) dismissals to be the exception rather than a rule.

More exacting standards will be developed over time, on a case by case basis, to guide the courts in using this discretion in a way which will benefit all parties. Suffice it to say that the factors which distinguish this case from the norm are: the willingness of the alleged debtor to make arrangements out of court for the repayment of its debt; the fact that some steps have been taken to effectuate such an arrangement; acquiescence in the alleged debtor's motion by a substantial body of creditors holding a substantial part of its debt; and the nature of the relationship which exists between the alleged debtor and one of the creditors who has petitioned for the order for relief.

In view of the foregoing, the petition against this alleged debtor should be dis-

missed under 11 U.S.C. § 305(a)(1). Costs shall not be allowed.[6]

It is so ORDERED.

[6] The Code authorizes assessment of costs and damages if a case is dismissed under section 303 other than on consent of all petitioners and the alleged debtor. 11 U.S.C. § 303(i). This section does not apply to dismissals under section 305 of the Code.