**In re J.M. CHECK CASHING CORP., Debtor.**

**Bankruptcy No. 180-05345.**

United States Bankruptcy Court, E.D. New York.

May 14, 1985.

Rich, Lillienstein, Krinsly, Dorman & Hochhauser, P.C., New York City (Randall S.D. Jacobs, New York City, of counsel), for claimant.

Jules V. Speciner, Great Neck, N.Y., for objectant.

Robert Cherofsky, Brooklyn, N.Y., for Gary Lewis/trustee.

## DECISION AND ORDER

CONRAD B. DUBERSTEIN, Chief Judge.

This is an involuntary Chapter 7. The case is dismissed for the reasons stated below.

## PROCEDURAL SETTING

On September 9, 1980, an involuntary petition for relief under Chapter 7 was filed by Louis G. Bernstein ("Bernstein") against J.M. Check Cashing Corp. ("J.M.") pursuant to 11 U.S.C. § 303(b)(2) [1]. The petition recited that J.M. owed him $36,000 based upon two loans he allegedly made to it. Because of an incorrect address, relief was delayed. Eventually, an order for relief was granted on January 20, 1981. Examination of various witnesses by way of depositions and under Bankruptcy Rule 205 (now Rule 2004) ensued.

A trustee in bankruptcy was appointed and he retained counsel. The trustee moved by order to show cause to compel Dr. Richard Katon, the debtor's principal, to file schedules of J.M.'s assets and liabilities as well as a statement of its financial affairs, all as required by § 521 of the Bankruptcy Code. In response, Dr. Katon made a cross-motion for an order dismissing the petition under § 305 of the Bankruptcy Code on the grounds that dismissal is in the interest of creditors and the debtor would be better served by such dismissal.[2]

---

**1.** 11 U.S.C. § 303(b)(2) states in pertinent part: (b) An involuntary case is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

. . . .

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549 or 724(a) of this title by *one* or more of such holders that *hold in the aggregate at least $5,000* of such claims.... (Emphasis added).

**2.** 11 U.S.C. § 305(a)(1) states:
(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend

While this issue was being argued before the court, Dr. Katon filed an objection to the allowance of a proof of claim filed by Bernstein for $36,000. He asserted that Bernstein was not a creditor of J.M. After consideration of the testimony, evidence and all the facts and circumstances, I find that Bernstein was not a creditor of the debtor, and this case should be dismissed for the reasons set forth below.

## FACTS AND BACKGROUND

This case begins with two little girls who grew up together in Brooklyn—Charlotte Brown, now Charlotte Katon, and Sylvia Jacobs. Mrs. Katon's son, Dr. Richard Katon, is a physician residing in Maryland. He is the principal of J.M., the debtor in this case. Sylvia Jacobs' son, Randall S.D. Jacobs, is an attorney. He represents Bernstein, the petitioning credititor who is an old friend of the Jacobs family.

Charlotte Katon's brother, Herbert Brown, was the original principal of J.M. Due to personal problems, he was unable to continue operating the business. Accordingly, sometime in late 1977 Dr. Richard Katon purchased the stock of J.M. from his uncle for $40,000. Dr. Katon became J.M.'s sole stockholder and its only officer and director. Since he lived in Maryland, he approached his lifelong friends, Irving and Sylvia Jacobs to physically operate the business which was located in Brooklyn, New York. They were employed by J.M. as manager and assistant.

J.M. was engaged in the check cashing business. In addition to cashing checks, J.M. was an authorized agent of American Express ("Amex") for the sale of its money orders. Dr. Katon executed a power of attorney on behalf of J.M. permitting Irving and Sylvia Jacobs to conduct the routine, daily operation of the business.

As an absentee owner, Dr. Katon had no contact with the business for approximately one year or more, other than some verbal communications with Irving Jacobs.

There was an element of basic trust between the Katons and Jacobs because of the long standing family relationship. However, in the winter of 1979 or early in 1980 Dr. Katon came to New York, took possession of the J.M. premises, including its books and records, locked the Jacobs out and ultimately sold the New York State check cashing license in June, 1980.

On May 6, 1980, after a spot check and audit, Amex commenced a suit in Supreme Court, State of New York, against J.M., as well as against Dr. Katon and his wife Virginia, on their personal guarantees, for failure to account for Amex money orders sold by J.M. After Dr. Katon took possession of the business, but before the license was sold, judgment was recovered against the three defendants in favor of Amex for $35,000 plus interest and costs. The judgment was settled for $17,500 which was paid by Dr. Katon. The judgment was assigned to Charlotte Katon, Dr. Katon's mother.

A third-party suit was brought in the aforesaid State Court action by J.M. and the individual defendants as third-party plaintiffs against Sylvia, Irving and Randall S.D. Jacobs, Joe Levine (J.M.'s former accountant) and Plaza Check Cashing Corp. ("Plaza"), a company which Irving Jacobs had begun with his old friend Louis Bernstein, the petitioning creditor. The third-party suit alleges among other claims, fraud, conspiracy and conversion of J.M. funds, specifically, monies collected from the sale of Amex money orders, to finance Plaza. The third-party suit has remained dormant since the filing of the involuntary petition.

After Bernstein filed the petition, he filed a proof of claim in this case. It indicated that the nature of the indebtedness to him was a "loan to the corporation in two checks, each for $18,000." Paragraph # 4 of the printed proof of claim form, which calls for information if the

all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension. . . .

claim is founded on a writing states: "Copy of personal check for $18,000 attached. Copy of bank check for remaining $18,000 to follow upon receipt." A photocopy of a check issued by Louis G. Bernstein on January 19, 1979 against his account at Bankers Trust Co. for $18,000 is attached to the proof of claim. It is payable to Irving Jacobs. The indorsement on it is stamped "For deposit to the account of J.M. Check Cashing." The check was deposited into a bank account maintained by J.M. at Manufacturer's Hanover Trust Co. ("MHT").

A bank check for $18,000 dated October 27, 1978, payable to "Randall Jacobs, Esq." was produced at the last hearing on the matter. It was indorsed by Randall Jacobs to J.M. and apparently deposited in J.M.'s account at MHT.

The verified list of creditors submitted by Bernstein listed one other creditor, Sylvia Jacobs.[3] She filed a proof of claim for $10,500 representing back salary of $500 and the "estimated liquidated value of stock of debtor owned by" her. Although not listed, the State and City of New York filed claims respectively for $515.50 and $960.00.

### DISCUSSION AND CONCLUSIONS OF LAW

Commencement of an involuntary bankruptcy case is governed by § 303 of the Bankruptcy Code which makes clear that a petitioning creditor must hold a "claim" against the debtor. Pursuant to § 502(a), once a proof of claim is filed, it is allowed, unless a party in interest objects. The proof of claim is itself prima facie evidence of the claim. (Bankruptcy Rule 3001(f)). Where a claim is based upon a writing, the original or duplicate must be filed with the proof of claim. (Bankruptcy (Rule 3001(c)). Once a proof of claim has been filed in accordance with this requirement, the burden of proof shifts to the objecting party to prove its allegations by a preponderance of the evidence. At hearings on the objection,

the court found that Dr. Katon had met this burden of rebuttal so that the claimant, Bernstein has the burden of proof on the issue. (Transcript of Sept. 11, 1984 at 16, 34, 36, 37).

At the hearings on the objection, as well as in all of the prior depositions, both Bernstein and Jacobs consistently testified that the basis for the claim, as stated in the proof of claim, was two separate loans by Bernstein to J.M. each in the sum of $18,000. As noted above, a copy of a personal check dated January 19, 1979 was annexed to the Bernstein proof of claim. Sylvia Jacobs recorded this check in the books of J.M. maintained in the ordinary course of business as a "personal investment." (Claimant's Memorandum, Nov. 27, 1984, Appendix C; Transcript of Oct. 3, 1984 at 65–66). Sylvia Jacobs did not testify herself.

According to the testimony of Bernstein and Jacobs a second loan of $18,000 was allegedly made sometime after January, 1979. Throughout all of the pre-trial depositions and Rule 2004 examinations Bernstein failed to produce the second check. Eventually, at the last hearing held before me on October 13, 1984, a bank check for $18,000 dated October 27, 1978 made payable to Jacobs' son Randall was produced. From its date, it is clear that this alleged "second check" was issued prior to the "first check".

█ From the testimony and other evidence submitted, Bernstein would have this court believe that he, an attorney and experienced businessman, loaned a substantial sum of his personal funds to a corporation in which he had neither a connection nor an interest, on a wholly unsecured basis without asking for or being offered any collateral. Furthermore, he made no request for any financial information concerning the assets and liabilities of the corporation, or its business operations. There were no promissory notes to evidence the alleged

---

**3.** In an involuntary bankruptcy case, Bankruptcy Rule 1008 requires that a petitioning creditor file a verified list of creditors.

loans nor was there any precise agreement or understanding as to the terms of repayment or interest. They were allegedly made solely on the request of an old and trusted friend.

After considering all the testimony and viewing the evidence, we do not find credible or plausible that Bernstein, a lawyer, versed in corporate law and in business would have made such loans to the corporation. Rather, we find that each check represented funds loaned or given to the named payee personally.

■ Where money is loaned to a corporate officer in his individual capacity, the fact that he later invested it in or loaned it to the corporation does not suffice to make it a loan of the original lender to the corporation. *In re Burntside Lodge*, 7 F.Supp. 785 (D.C.D.Minn.1934). "[The] loan to [the corporate officer is] a personal transaction between [the lender] and him, and [the lender's] claim is against him and not the bankrupt estate of the corporation." *Id.* at 787. Here Jacobs was not even an officer of the corporation. We find the transactions were personal ones. This is so regardless of whether the loan is recorded in the corporate books as a loan or an investment. Bernstein points to a note on the back of J.M.'s daily report sheet for October, 1978 stating "Loan Payable". (Objectant's Exhibit H.) That may be so, but there is no indication whether the loan was made by Bernstein. It could have been a loan made by Irving or Randall Jacobs to J.M.

■ Irving Jacobs' contention that he had power to borrow funds on behalf of J.M. rests on the power of attorney granted him. However, a careful reading of that power of attorney reflects there was no authority to borrow money. He was given limited powers to act "in connection with the routine, daily operation of the business ... but specifically excluding the authority, unless otherwise authorized ... to perform any act not in the ordinary and normal course of the operation of the business." (Creditor's Exhibit 2, Oct. 3, 1984 at 2.) Surely borrowing $36,000 was not a routine, daily operation, nor was it in the ordinary course of business.

The fact that Irving Jacobs acted on behalf of the corporation in obtaining advances from MHT does not provide a justification for his claim to have had broad borrowing powers. Such funds as were advanced by MHT for routine operations were immediately credited to J.M.'s account. That was not the course of events in the present case.

Having decided that Bernstein is not a creditor of J.M., we must determine whether (1) there are any other creditors whose interests would be served by the bankruptcy petition which gave rise to these proceedings, and (2) if there are, should this case be dismissed in any event.

■ Three claims were filed in addition to the Bernstein claim. Sylvia Jacobs' claim for $500 back salary is too inconsequential to warrant a bankruptcy proceeding. She always has a claim against the principals of the corporation for wages due. Her claim for the liquidated value of her stock does not come within the scope of a claim as defined in § 101(4) of the Bankruptcy Code.[4] As a shareholder she has an interest in the corporation and not a "right to payment" or a "right to an equitable remedy" as required by that subsection.

■ The State and City of New York filed claims for $515.50 and $960.00 respectively although they were not listed on the verified list of creditors. It is the court's opinion based on considerable experience that these are arbitrary claims filed in

---

4. 11 U.S.C. § 101(4) states:
 (4) "claim" means—
 (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

 (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured disputed, undisputed, secured, or unsecured....

round amounts, a common practice followed by those two taxing authorities so they may later file amended claims, if any, so as not to be precluded from participation should there be a distribution of the estate. In any event the list of creditors filed by Bernstein in this case does not reflect any taxes due nor was any proof presented that such claims exist.

 In light of the foregoing facts, this court is of the opinion that this bankruptcy case should be dismissed. Had the debtor moved for a dismissal immediately after the involuntary petition was filed on the ground that Bernstein was not a creditor, and had it established that as a fact at that time this court would have been bound to dismiss the petition on the ground that there was a failure to comply with § 303 which requires that a petitioning creditor hold a claim of at least $5,000. There is undeniably no other creditor who could have qualified. Neither Mrs. Jacobs nor any of the taxing authorities could qualify. There is no question that the Bankruptcy Court in its capacity as a court of equity guided by equitable doctrines and principles has the power to dismiss a case when its jurisdiction is improperly invoked. *See e.g., In re Century City, Inc.,* 8 B.R. 25, 29 (Bkrtcy.D.N.J.1980).

 Does the fact that the debtor failed to move expeditiously to dismiss alter the outcome? I believe not. It conducted discovery proceedings, examined the petitioning creditor and objected to Bernstein's claim.

Although I find that Bernstein is not a creditor of J.M. and, therefore, he could not have acted as a petitioning creditor to commence a bankruptcy case against J.M., even if the factors warranted a finding that he was a creditor, I would have invoked the right of abstention as provided by § 305, and dismissed the case in any event. It is abundantly clear that the sole and real parties in interest in the transactions involved in this case are Bernstein, Jacobs and the debtor's principal, Dr. Katon. Their differences, respective rights and obligations can best be determined in a court other than this Bankruptcy Court. If it were ultimately determined contrary to my opinion, that Bernstein has a valid claim against J.M., he can bring suit against it in the state court, or in a federal court where diversity of citizenship would justify such an action, as the facts warranted it. If, as he claims, all of J.M.'s assets were diverted by Dr. Katon, he could also bring on supplementary proceedings against him to seek recovery of the assets or their value. Jacobs could do likewise if Bernstein should decide to proceed against him. Thus, under the circumstances presented by this case, there is no reason to keep it in the Bankruptcy Court. The interest of the creditors, if any, and the debtor would best be served by such dismissal. *In re Luftek,* 6 B.R. 539, 547 (Bkrtcy.E.D.N.Y.1980); *See also In re RAI Marketing Services, Inc.,* 20 B.R. 943, 945 (Bkrtcy.D.Kan.1982).

SO ORDERED.